**James Michael SIGGERS,
Plaintiff–Appellant,**

v.

**Ronald E. BARLOW, M.D.,
Defendant–Appellee.**

**No. 89–5459.**

United States Court of Appeals,
Sixth Circuit.

Argued April 9, 1990.

Decided June 26, 1990.

---

W. Douglas Myers (argued), Deatherage, Myers & Haggard, Hopkinsville, Ky., for plaintiff-appellant.

Francis T. Goheen (argued), Goheen, Garrett & McCann, Paducah, Ky., for defendant-appellee.

Before KEITH and MILBURN, Circuit Judges, and WOODS, District Judge.[*]

WOODS, District Judge.

In this medical malpractice case, the plaintiff, James Michael Siggers ("Siggers") appeals from the district court's order granting the motion for judgment notwithstanding the verdict ("JNOV") of the defendant, Ronald E. Barlow, M.D. ("Dr. Barlow"). For the reasons stated herein, we affirm.

I.

On July 27, 1986, Siggers, while an active duty member of the United States Army, 101st Airborne Division, Command Demonstration Parachute Team, made several exhibition parachute jumps at the waterfront in Paducah, Kentucky. During the landing of his second jump, Siggers was blown onto the roof of a mobile home where he struck the air conditioning unit and fell to the ground. In the fall, he severely fractured his right wrist and lacerated his left thigh.

Siggers was taken to the emergency room at Western Baptist Hospital (the "Hospital"). The admitting nurse took Siggers' name, address, and telephone number, and then directed him to the radiology department to have his wrist x-rayed. Upon returning to the emergency room, Siggers was met by Dr. Barlow, the on-duty emergency room physician. Dr. Barlow examined Siggers' thigh and determined that it did not need stitches. He then read the x-rays and examined Siggers' wrist. Dr. Barlow mistakenly diagnosed the wrist injury as a sprain and entered a "negative" finding in his report. Dr. Barlow failed to diagnose the navicular fracture or the perilunate dislocation in Siggers' wrist. Siggers was then released by Dr. Barlow with no further scheduled care, even though further medical treatment on the wrist was needed within 7 to 14 days to help restore the wrist to its previous condition.

Later that same day, pursuant to Hospital procedure, the on-duty staff radiologist, Dr. Robert A. Davis, reviewed the x-rays of Siggers' wrist. Dr. Davis identified the navicular fracture and perilunate dislocation and noted the discrepancy between his findings and those of Dr. Barlow. Dr. Davis then took the x-rays to the emergency room where he made an oral report of his findings to an unidentified emergency room nurse. Dr. Barlow was not present in the emergency room at that time and never learned of Dr. Davis' oral report from the nurse.[1]

Dr. Davis then dictated a report of his findings and sent the dictated report to other Hospital personnel to be transcribed. The written report was forwarded to the Hospital's medical records department where it was once again compared with the emergency room records. The medical records department then sent the written report of Dr. Davis to the emergency room.

Pursuant to established Hospital procedures at the time, the duty to notify a

* The Honorable George E. Woods, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Dr. Barlow testified that he never learned of the misdiagnosis until he was served with the summons and complaint of Siggers almost a year later.

patient of a misdiagnosed x-ray was placed on the emergency room physician on duty at the time the written radiologist's report was received in the emergency room. The written report of Dr. Davis found its way to the emergency room on August 1, 1986, where it came into the hands of Dr. Robert W. Robertson, the on-duty emergency room physician.

Dr. Robertson attempted to contact Siggers personally by telephone at Fort Campbell, Kentucky, but was unsuccessful. Dr. Robertson then telephoned the Blanchfield Army Community Hospital at Fort Campbell and eventually spoke with Sergeant Terri Cloud, an Administrative NCO. Dr. Robertson explained to Sgt. Cloud the misdiagnosis of Siggers' wrist injury and the need for further medical treatment. Sgt. Cloud agreed to relay the message to Siggers. Sgt. Cloud, however, was also unable personally to locate Siggers, so she instead left a message at his Troop Medical Clinic. Unfortunately, Siggers was never notified by his Troop Medical Clinic (or any other party) of the misdiagnosis and the need for further medical care.

Eventually, Siggers did seek medical care on September 8, 1986, after the pain in his wrist became unbearable.[2] Siggers went to his Troop Medical Clinic where his wrist was again x-rayed and the dislocation and fracture discovered. Surgery on Siggers' wrist was performed on September 24, 1986. Even after surgery, however, the wrist remained in a condition of extensive physical impairment, and Siggers was eventually medically retired from the Army. It is undisputed that Siggers' wrist injury contained a post-injury "window" period of about 7 to 14 days during which time surgery could have been performed to restore the wrist to virtually its previous normal condition. After this time, however, the natural healing of the bones would complicate surgery far beyond that which would have been encountered shortly after injury.

On July 7, 1987, Siggers filed his complaint based on diversity jurisdiction in the United States District Court for the Western District of Kentucky, Paducah Division. The named defendants were Dr. Barlow and Western Baptist Hospital.[3] Western Baptist Hospital was dismissed as a party by an order dated November 29, 1988. Siggers' case against Dr. Barlow was tried before a jury on November 29 and 30, 1988. At the close of the evidence, both parties moved for a directed verdict. Fed.R.Civ.P. 50(a). The district court denied Siggers' motion, but deferred ruling on Dr. Barlow's motion. Instead, the case was submitted to the jury, who returned a verdict in favor of Siggers. Judgment was entered on December 7, 1988. Dr. Barlow then filed a motion for JNOV, Fed.R.Civ.P. 50(b), or in the alternative, for a new trial, Fed.R. Civ.P. 59. The motion for JNOV was granted by the district court and the jury verdict set aside on March 27, 1989. On April 10, 1989, Siggers filed a timely notice of appeal.

The district court granted Dr. Barlow's motion for JNOV based upon the finding that the duty to notify Siggers of the misdiagnosis had shifted by agreement pursuant to Hospital procedures from Dr. Barlow to Dr. Robertson, the physician on duty in the emergency room when the written radiologist's report arrived from the medical records department. The district court employed *Restatement (Second) of Torts* § 452(2) and concluded that the failure of Dr. Robertson and military personnel to notify Siggers of the misdiagnosis constituted a superseding cause[4] relieving Dr. Barlow of all liability for the initial misdiagnosis.

On appeal, Siggers makes two principal arguments for the reversal of the district court's order granting the motion for

---

**2.** No evidence was presented at trial that Siggers himself aggravated his undiagnosed wrist injury.

**3.** Dr. Robertson was not named a defendant in this action.

**4.** *Restatement (Second) of Torts* § 440 defines a superseding cause as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."

JNOV. First, Siggers argues that this is an inappropriate case for the application of the superseding cause exception of section 452(2) since both Dr. Barlow and Dr. Robertson are independent contractors where no express agreement existed between the two doctors to shift the duty to notify Siggers of the misdiagnosis from one to the other. Second, Siggers argues that there is a dispute of fact as to who was the on-duty emergency room physician when the radiologist's report arrived from the medical records department, and thus a dispute as to who was responsible under Hospital procedure for notifying Siggers of the misdiagnosis.

## II.

Although no Kentucky court has ever specifically applied section 452(2), the district court noted that the Kentucky courts have in the past utilized *Restatement (Second) of Torts* §§ 440–453 in addressing matters of superseding cause in tort litigation. *See House v. Kellerman*, 519 S.W.2d 380 (Ky.1975). The district court thus properly applied section 452(2) as it believed the Kentucky courts would. *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir.1985). The district court also properly noted that under Kentucky law the issue of superseding cause is a legal issue to be resolved by the court. *House*, 519 S.W.2d at 382; *Restatement (Second) of Torts* § 453.

Section 452 of the *Restatement (Second) of Torts* reads as follows:

Third Person's Failure to Prevent Harm

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

An analysis of section 452 must necessarily begin with a discussion of the Comments to that section. Comment (a) states the general situation to which section 452 as a whole is directed, *i.e.*, where an original negligent actor has created an unreasonable risk of harm to another and a third party is in a position to prevent that harm by taking some sort of affirmative action.

Comments (b) and (c) note that subsection (1) states the general rule that the failure of a third person to act to prevent the threat of harm, or a third person's subsequent negligent actions which increase the threat of harm, is ordinarily considered a concurrent cause of the resulting harm rather than a superseding cause. Thus, in the ordinary case the original negligent actor will not be relieved of liability. *See Parker v. Redden*, 421 S.W.2d 586 (Ky.1967); *Peterson v. Bailey*, 571 S.W.2d 630 (Ky.Ct.App.1978).

Comments (d) and (e) explain the "exceptional" situations in which subsection (2) might be applied, thereby relieving the original negligent actor from all responsibility for any resulting harm. These situations arise where the entire duty to act to prevent the threat of harm has shifted from the original negligent actor to a third person. One way in which the duty may be shifted is by express agreement between the original actor and the third person. *See* Illustrations in Comment (e) to § 452.

Siggers argues that no express agreement existed here whereby Dr. Barlow specifically asked Dr. Robertson to notify Siggers of the misdiagnosis and Dr. Robertson specifically agreed to do so. Siggers thus argues that this is an improper case in which to apply the superseding cause exception of section 452(2), and that this Court should instead apply the general rule of concurrent cause under section 452(1). We disagree.

Although it is true that there was no express agreement between Dr. Barlow and Dr. Robertson to shift the duty to notify Siggers, there was at least an implied agreement to do so. Both physicians were employed by the Hospital in a similar capacity and both physicians were required to abide by established Hospital proce-

dures. Both physicians were also fully aware of the established Hospital procedures for notifying a patient of a misdiagnosed x-ray. Nothing in the record suggests that either of the physicians ever objected to those procedures.

Furthermore, this implied agreement between the two emergency room physicians and the Hospital had the same effect as an express agreement in that the shift of responsibility to notify Siggers of the misdiagnosis was a complete shift of responsibility. Once the radiologist's report was received by Dr. Robertson while on duty in the emergency room, all responsibility for notifying Siggers of the misdiagnosis was shifted from Dr. Barlow to Dr. Robertson. Under established Hospital procedure, Dr. Robertson now bore full responsibility for notifying Siggers of the misdiagnosis, and it is undisputed that Dr. Robertson did in fact undertake this responsibility. An implied agreement to shift responsibility thus existed between the two physicians.

Furthermore, an express agreement is not the only circumstance where a superseding cause may be found under section 452(2). This is evidenced by Comment (f), which states as follows:

> f. Even in the absence of any contract or agreement, the circumstances may be such that the court will find that all duty and responsibility for the prevention of the harm has passed to the third person. It is apparently impossible to state any comprehensive rule as to when such a decision will be made. Various factors will enter into it. Among them are the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations. The most that can be stated here is that when, by reason of the interplay of such factors, the court finds that

full responsibility for control of the situation and prevention of the threatened harm has passed to the third person, his failure to act is then a superseding cause, which will relieve the original actor of liability.

Although the district court relied primarily on Comment (d) (express agreement), the district court also properly considered the factors listed in Comment (f) since the unique fact situation presented here did not fit neatly into any one comment or illustration.[5]

An analysis of the factors listed in Comment (f) set forth above supports a finding of superseding cause. Although the risk of harm to Siggers as created by Dr. Barlow's initial misdiagnosis was great, this risk of harm did not materialize until 7 to 14 days after the injury occurred. Up until this post-injury window period closed, surgery could have been performed on the wrist to restore it to virtually its previous normal condition. An adequate amount of time thus existed for Dr. Robertson to notify Siggers of the misdiagnosis before the risk of harm reached an emergency stage (*i.e.*, before the risk of harm became a resulting harm).

The character and position of Dr. Robertson supports a finding that he is an appropriate party onto whom the duty to notify Siggers of the misdiagnosis could be shifted. Dr. Robertson is a trained emergency room physician, and was fully aware of the nature and gravamen of the risk of harm to Siggers. It could thus be expected that Dr. Robertson would properly exercise the duty to notify Siggers of the risk of harm.

The relationship of Dr. Robertson to Dr. Barlow further supports a finding that this was an appropriate case in which to shift the duty to notify Siggers of the impending harm. Both physicians were employed as emergency room physicians on the same Hospital staff. Both physicians thus operated under the same established Hospital procedures, including those procedures established for notifying a patient of a mis-

---

**5.** Comment (e) to *Restatement (Second) of Torts* § 452(2) candidly admits that "[i]t is beyond the scope of this Restatement to attempt to state

when the duty can be shifted, and when it cannot."

diagnosed x-ray. Furthermore, the Hospital procedures themselves were not irrational or patently against public policy. Their obvious purpose was to ensure that a patient is notified as soon as possible of a misdiagnosed x-ray, *i.e.* as soon as the radiologist's report noting the misdiagnosis is received in the emergency room. All of these factors support a finding that the failure of Dr. Robertson properly to notify Siggers of the misdiagnosis acted as a superseding cause thereby relieving Dr. Barlow of all liability.

Siggers relies on several California cases in support of the argument that this is a case of concurrent cause under section 452(1) rather than superseding cause under section 452(2). *See Hart v. Browne*, 103 Cal.App.3d 947, 163 Cal.Rptr. 356 (1980); *Cline v. Watkins*, 66 Cal.App.3d 174, 135 Cal.Rptr. 838 (1977); *Fish v. Los Angeles Dodgers Baseball Club*, 56 Cal.App.3d 620, 128 Cal.Rptr. 807 (1976). These cases, however, are inapposite to the present matter. Each involved two or more separate acts of negligence where the actors were in no way associated with one another.

For example, in *Fish v. Los Angeles Dodgers Baseball Club*, a 14–year–old boy was struck in the head with a foul ball while attending a Los Angeles Dodgers baseball game. The Dodger Stadium emergency care physician examined the boy and determined that he had merely suffered a bump on the head. The boy was released without any further scheduled care and allowed to return to watch the game. Later that evening, after the boy was feeling ill, his parents took him to an emergency room at a children's hospital where the boy was examined by a neurosurgeon. The neurosurgeon failed to detect the necessity for emergency surgery and the boy died several days later from an intracerebral hemorrhage caused by a hairline fracture of his skull. Expert testimony at trial indicated that the hemorrhaging would have stopped naturally had the stadium physician immobilized the boy immediately after the injury. Additionally, the testimony indicated that had emergency surgery been performed by the neurosurgeon as soon as the boy entered the children's hospital, he would have made virtually a complete recovery. 56 Cal.App.3d at 624–29, 128 Cal. Rptr. at 811–14.

On appeal, the California Court of Appeals reversed the trial court's entry of a jury verdict in favor of defendants. The appellate court held that the trial court had failed to give a proper jury instruction on concurrent causes stating to the effect that the subsequent negligence of the neurosurgeon was no defense to the stadium physician's initial negligence if both acts of negligence were found to be a substantial factor in the boy's death. 56 Cal.App.3d at 639, 128 Cal.Rptr. at 821. In so holding, the appellate court rejected the stadium physician's argument that the neurosurgeon's subsequent failure to perform emergency surgery acted as a superseding cause under section 452(2) upon the initial negligence of the stadium physician. *Id.*

The facts which distinguish *Fish* from the present matter are obvious. In *Fish* the threat of harm to the injured boy was immediate and treatment to prevent the threat of harm from materializing was immediately needed. Once the stadium doctor failed to treat the boy's head injury he then created the need for emergency surgery which had to be performed within an extremely short period of time. Here, although immediate treatment of Siggers' wrist obviously would have been preferred, the risk of harm to Siggers did not reach emergency proportions until 7 to 14 days after the initial injury, thus allowing an adequate amount of time in which to prevent the threat of harm from materializing. Furthermore, in *Fish* the two negligent doctors were acting wholly independently of each other with neither assuming the responsibility of the other through any agreement, express or implied. Their only connection was that they had both negligently examined the same boy. Here, both Dr. Barlow and Dr. Robertson were emergency room physicians on the staff of the same hospital where one directly assumed the responsibility of the other toward Siggers by virtue of established hospital procedure.

The Court thus holds that this was an appropriate case in which to apply the superseding cause exception of section 452(2).

### III.

Siggers' second argument on appeal is that an issue of fact exists as to who was the physician on duty at the time the written radiologist's report was received in the emergency room, and therefore an issue as to who was responsible for notifying Siggers of the misdiagnosed x-ray.[6]

■ In a case founded on diversity jurisdiction, a district court must look to state law to determine whether the evidence is sufficient to withstand a motion for JNOV. *Calhoun v. Honda Motor Co., Ltd.*, 738 F.2d 126, 129 (6th Cir.1984). Under Kentucky law, a motion for JNOV is governed by the same standards applied to a motion for directed verdict. *Cassinelli v. Begley*, 433 S.W.2d 651, 652 (Ky.1968). In ruling on either motion, the district court must consider the evidence in the light most favorable to the party opposing the motion, drawing from that evidence all fair and rational inferences in the opposing party's favor. *Spivey v. Sheeler*, 514 S.W.2d 667, 673 (Ky.1974); *Sutton v. Combs*, 419 S.W.2d 775, 777 (Ky.1967). On appeal, this court must review the evidence in the same light as the district court. *Sutton*, 419 S.W.2d at 777; *Upton v. Western Life Ins. Co.*, 492 F.2d 148, 149 (6th Cir.1974).

A careful review of the record indicates that the evidence adduced at trial adequately supports the district court's finding that Dr. Robertson was the emergency room physician on duty at the time the written radiologist's report was received, and therefore the physician upon whom the duty to notify Siggers of the misdiagnosis was placed.

Dr. Barlow examined Siggers in the emergency room on Sunday, July 27, 1986. At the time, Dr. Barlow was working a 14–hour shift, from 5:00 p.m. to 7:00 a.m., and was scheduled to be on duty for the next four days, until Wednesday, July 30. Dr. Davis, the on-duty radiologist, testified that he dictated his report on Sunday, July 27, and forwarded the dictated report to be transcribed that same day. Dr. Robertson testified that he was on duty in the emergency room on the morning of Friday, August 1. He further testified that he first learned of the radiologist's report that same morning. The emergency room records indicate that Dr. Robertson also attempted to telephone Siggers at Ft. Campbell on that same Friday morning at about 10:00 a.m.

Siggers argues that the testimony of all the above doctors at trial was that in a normal case the radiologist's report is received in the emergency room within two days of being dictated. Siggers therefore argues that the report of Dr. Davis was most likely received in the emergency room on Monday, July 28, a day when Dr. Barlow was still scheduled to be on duty. However, this was not a normal case. Dr. Davis testified that since his report was dictated on Sunday, July 27, it would not be transcribed until at least Monday, July 28, since at that time the Hospital did not schedule a typist to work on weekends. As a result, Dr. Davis further testified, a backlog of reports would necessarily pile up for the typist on Monday mornings. It thus becomes evident that the report of Dr. Davis must have been lost in the backlog for several days, and not received in the emergency room until Friday, August 1, the day Dr. Robertson actually attempted to notify Siggers of the misdiagnosis.[7]

**6.** Although Dr. Davis testified that he initially made an oral report of the misdiagnosis to an unidentified emergency room nurse on Sunday, July 27, the day that Siggers was injured, the undisputed testimony at trial indicated that Hospital procedures placed full responsibility for notifying a patient of a misdiagnosed x-ray upon the emergency room physician on duty at the time the *written* radiologist's report was actually physically received in the emergency room from the medical records department.

**7.** It is only logical to assume that the radiologist's report was first received in the emergency room on Friday, August 1, the day Dr. Robertson was on duty. Had that not been the case, Dr. Robertson would have had no reason to attempt to notify Siggers of the misdiagnosis.

The Court thus finds, after viewing the evidence in a light most favorable to Siggers, that the only rational inference to be drawn from the evidence is that the written radiologist's report was received in the emergency room on the morning of Friday, August 1, while Dr. Robertson was on duty. Dr. Robertson was thus the emergency room physician charged with notifying Siggers of the misdiagnosis under Western Baptist Hospital procedure.

## IV.

Accordingly, the order of the district court granting the motion for judgment notwithstanding the verdict is

AFFIRMED.