REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2170

September Term, 2014

_____

JENNY J. COPSEY, ET AL.

v.

JOHN S. PARK, M.D., ET AL.

_____

Krauser, C.J.,
Nazarian,
Reed
* Judge Timothy Meredith did not
participate, pursuant to Md. Rule 8-
605.1, in the Court's decision to report
this opinion.

JJ.
_____

Opinion by Reed, J.
_____

Filed: May 31, 2016

This case involves a medical malpractice action by the wife, minor daughters, and mother of Lance Copsey, deceased, against John S. Park, M.D. The appellants assert that Dr. Park negligently misread Mr. Copsey's MRI/MRA six days before he suffered a massive, and ultimately fatal, stroke. Over the appellants' objections, the trial court permitted Dr. Park to present evidence of negligence by subsequent treating physicians and instructed the jury on superseding cause. In the end, however, the jury did not reach the question of superseding cause because they found Dr. Park's reading of the MRI/MRA non-negligent (*i.e.*, that Dr. Park was not an actual, much less a proximate, cause of Mr. Copsey's death). Appellants timely appealed and present a single question for our review, which we rephrased:[1]

> 1. Did the circuit court err in admitting evidence of the negligence of subsequent treating physicians and instructing the jury on superseding causation?

For the following reasons, we answer this question in the negative. Therefore, we affirm the judgment of the circuit court.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 4, 2010, Mr. Copsey presented to the emergency room of the Anne Arundel Medical Center following an incident on a racquet ball court in which he fell and

---

[1] Appellants presented the following question *verbatim*:

> 1. Did the trial court err by admitting evidence of the negligence of subsequent treating physicians and instructing the jury on superseding causation, where such concurring negligence resulted in an indivisible injury (death) and could not have amounted to a superseding cause, as a matter of law?

hit the back of his head. He did not lose consciousness in connection with the fall, but nevertheless complained of nausea and headaches. He was released after being treated and undergoing a head CT scan, which was reported as normal.

Mr. Copsey presented to the Anne Arundel Medical Center emergency room again on May 26, 2010. He indicated that he had been experiencing intermittent, minutes-long episodes of dizziness since that morning. Another CT scan was performed on his head, but again the results were normal. Therefore, he was instructed to call his internal medicine physician the next day to schedule a "close" follow-up appointment and to return to the emergency room should his symptoms worsen.

Mr. Copsey was seen by his primary care physician, Aditya Chopra, M.D., on June 1, 2010. In addition to complaining of difficulty walking, nausea, and headaches, he indicated that the vertigo he began experiencing on the day he last presented to the emergency room had not gone away. Dr. Chopra prescribed Meclizine and a Z-Pack, suggested a follow-up with an ear, nose, and throat doctor should the symptoms not improve, and advised consulting an ophthalmologist. In accordance with Dr. Chopra's advice, Mr. Copsey consulted ophthalmologist Ross D. Elliott, M.D., on June 2, 2010. Dr. Elliott determined there was no ophthalmological etiology for Mr. Copsey's symptoms and, in turn, recommended both a neurologic consultation and a neuroradiologic evaluation. These were performed on June 4, 2010, by Dr. Chopra, who found multiple abnormalities consistent with central nervous system involvement and sent Mr. Copsey promptly to the emergency room.

Per Dr. Chopra's advice, on the afternoon of June 4, 2010, Mr. Copsey presented back to the emergency room of the Anne Arundel Medical Center. He complained of vertigo of approximately a week's duration and also reported experiencing numbness in the right side of his face, right arm, and right leg, headaches, mild shortness of breath, minutes-long episodes of double vision, and trouble walking. Mr. Copsey's initial emergency room evaluation was performed by Charles Iliff, M.D., who then consulted with neurologist Larry Blum, M.D. It was decided that a head CT scan and a brain MRI/MRA would be performed.

The CT scan and MRI/MRA were interpreted on June 4, 2010, at 4:02 p.m. and 6:45 p.m., respectively, by the named appellee, John S. Park, M.D. Dr. Park's impressions were of a normal non-contrast head CT and brain MRI and a normal intracranial MRA. Specifically, regarding the CT scan, MRA, and MRI, correspondingly, he found:

> There is no evidence of acute intracranial hemorrhage, infarction, mass effect, or midline shift. No abnormal extraaxial fluid collections are identified. The ventricles, sulci, and cisterns are normal. There is no acute injury to the skull base or calvarium.

> \* \* \*

> There is normal anatomy of the circle of Willis with no evidence of aneurysm, anteriovenous malformation, or abnormal vessel cut-off. No hemodynamically significant stenosis is identified. Incidental note is made of fenestration of the left vertebral artery.

> \* \* \*

> There is no evidence of acute intracranial hemorrhage, infarction, mass effect, or midline shift. No abnormal extraaxial fluid collections are identified. The ventricles, sulci,

3

and cisterns are normal. The flow voids at the skull base are normal. There is no acute injury to the skull base or calvarium.

Dr. Blum later reviewed the MRI and MRA images interpreted by Dr. Park and confirmed they did not reveal any abnormalities. In fact, Dr. Blum suspected Mr. Copsey's symptoms were merely *sequelae* of migraine equivalents. Mr. Copsey was diagnosed with migraines, cluster migraines, vertigo, hypercholesterolemia, and mildly elevated blood pressure, but it was also noted on his discharge summary dated June 6, 2010, that he was "otherwise doing fine."

Mr. Copsey was seen by Dr. Chopra for an outpatient evaluation on June 7, 2010. Mr. Copsey reported having no chest pain, dizziness, shortness of breath, cough, nausea, vomiting, diarrhea, constipation, aches or pains, headache, or burning urination. Dr. Chopra noted no neurological deficit and instructed Mr. Copsey to return to the emergency room and/or follow up with Dr. Blum should his symptoms return, which they did the very next day. Therefore, on June 9, 2010, Mr. Copsey returned to Dr. Blum for a follow-up evaluation.

At his follow-up on June 9, Mr. Copsey reported the return of his diplopia, or double vision, and headaches, and also indicated that he had begun experiencing hiccups and trouble swallowing for the first time. The onset of the latter two of these symptoms was particularly concerning to Dr. Blum. Therefore, he ordered another brain MRI, this time requesting an urgent interpretation.

Mr. Copsey proceeded directly to the Anne Arundel Medical Center where this, the second MRI of his brain, was performed. Vijay Viswanathan, M.D., interpreted the image and concluded the following:

1. Ill-defined new band-like signal abnormality within the right lateral medulla which is nonspecific but is concerning for acute infarction. This is a new finding since the prior study dated June 4, 2010.
2. This could be suggestive of lateral medullary syndrome/Wallenberg syndrome.
3. Left vertebral artery abnormal flow void which is nonspecific. It is difficult to appreciate the connection between right medullary abnormality and left vertebral artery abnormality. Clinical correlation advised.
4. No evidence of intraorbital pathology.

Dr. Viswanathan interpreted the MRI at 4:02 p.m. and dictated his report at approximately 4:42 p.m. However, he did not notify the on-call neurologist, Damanhuri Alkaitis, M.D., of his findings until approximately 10:30 p.m. Dr. Blum recounted this delay in a hospital note dated June 10, 2010, the day after the MRI was performed, as follows: "I had noted in my requisition that I requested an urgent call-back from the radiologist, but that did not transpire." Dr. Blum could have, however, accessed Dr. Viswanathan's impression earlier either by logging into the Medical Center's computer database or following up with the radiology department. Instead, he opted to review the MRI films himself, which he did at approximately 6:00 p.m. His interpretation of the films was that "[t]he MRI scan did not disclose [any] abnormalities." Therefore, he sent Mr. Copsey home for the night.

Mr. Copsey had already been sent home by the time Dr. Viswanathan notified Dr. Alkaitis of the MRI results at 10:30 p.m. on June 9, 2010. Dr. Alkaitis did not take any action regarding the results that night, nor did anyone advise Mr. Copsey that a lateral

5

medullary infarct had been discovered. At approximately 4:00 a.m. on June 10, 2010, Mr. Copsey awoke to use the bathroom and suffered a major stroke. His wife found him lying on the floor unable to get up and had him rushed to the Anne Arundel Medical Center emergency room, where he arrived at approximately 5:44 a.m. A promptly-performed brain CT scan showed a right medullary hypodensity indicative of an acute stroke. Mr. Copsey's already poor condition deteriorated considerably at approximately 11:00 a.m. on June 10, 2010. He was subsequently transferred to Johns Hopkins Hospital, where, on the morning of June 11, 2010, after receiving an angioplasty and stent in his right vertebral artery, he became unresponsive with pinpoint pupils, no corneal or gag reflexes, and lack of movement in his extremities. He passed away on June 13, 2010, at 6:20 p.m.

On September 27, 2011, the appellants filed survival and wrongful death actions in the Circuit Court for Anne Arundel County against Drs. Park, Viswanathan, Blum, and Alkaitis. The appellants alleged that between June 4 and June 10, 2010, each of the four doctors "negligently failed to timely diagnose [Mr. Copsey's] evolving stroke and refer him for timely and appropriate treatment." The appellants sought to hold all four defendants jointly and severally liable. However, the appellants entered into pre-trial settlements with Dr. Blum and Dr. Alkaitis and, on September 17, 2014, the day after the trial began, voluntarily dismissed Dr. Viswanathan, leaving Dr. Park to stand trial as the sole defendant.

On August 26, 2014, the appellants filed two pre-trial motions *in limine*. The first was to preclude Dr. Park from raising as a defense that the negligence of subsequent treating physicians was a superseding cause, while the second was to exclude all evidence

6

relating to Dr. Blum and Dr. Alkaitis' prior status as defendants or pre-trial settlements. On the first day of trial, after hearing arguments from both sides, the Honorable Paul G. Goetzke denied both motions. The trial lasted seven days. Finally, on September 24, 2014, the jury returned a verdict in favor of Dr. Park. This timely appeal followed.

## DISCUSSION

### I. ADMISSIBILITY OF EVIDENCE OF NEGLIGENCE BY SUBSEQUENT TREATING PHYSICIANS (AND PROPERNESS OF THE SUPERSEDING CAUSE INSTRUCTION)

#### A. Parties' Contentions

The appellants argue the trial court erred in denying both of their pre-trial motions *in limine*. As for their first motion, which was to exclude all evidence relating to Dr. Blum and Dr. Alkaitis previously being defendants in the case before entering into settlement agreements, the appellants assert the trial court's denial was based upon unsound reasoning. Specifically, the appellants contend the trial court's statement that evidence relating to Dr. Blum and Dr. Alkaitis' prior status as defendants and settlement agreements would be probative on the issue of bias should they be called as witnesses proved inapropos when Dr. Park never called them to testify.

The appellants also argue the trial court erred in denying their second motion *in limine*, which, again, was to exclude all evidence relating to the alleged negligence by subsequent treating physicians Blum, Viswanathan, and/or Alkaitis. The appellants assert that this evidence is inadmissible because, pursuant to *Martinez ex rel. Fielding v. The Johns Hopkins Hospital*, 212 Md. App. 634 (2013), negligence by subsequent treating physicians is insufficient as a matter of law to establish superseding cause. They contend

7

that once Drs. Blum, Viswanathan, and Alkaitis were no longer parties to the case, evidence of their alleged negligence became unfairly prejudicial and irrelevant as to whether Dr. Park negligently interpreted Mr. Copsey's head CT scan and brain MRI/MRA on June 4, 2010. The appellants argue that under Maryland law, the actions of joint tortfeasors need not be simultaneous. They point to an abundance of case law, as well as to § 879 of the Restatement (Second) of Torts,[2] as supporting their assertion that Dr. Park was a joint tortfeasor because his negligence combined, albeit not simultaneously, with *foreseeable* acts of negligence by others to create an indivisible harm. Therefore, the appellants contend he was jointly and severally liable for Mr. Copsey's death, and that the trial court abused its discretion in allowing him to pursue the superseding cause defense by admitting evidence of the alleged negligence of subsequent treating physicians.

The appellants argue the trial court, by admitting the subject evidence of the motions *in limine*, invited the jury to draw a number of impermissible inferences, including: That Dr. Alkaitis was solely liable because he had the last chance to save Mr. Copsey's life; that multi-million dollar settlements had already been obtained against Dr. Blum and/or Dr. Alkaitis; and that the reason why Dr. Blum and/or Dr. Alkaitis were no longer defendants was because they were dismissed by the court for lack of evidence. Because the possibility exists that the jury's verdict derived from one or more of these inferences, the appellants pray we grant their motion for a new trial.

---

[2] "If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, *irrespective of whether their conduct is concurring or consecutive*." (emphasis added).

8

The appellees preliminarily argue the issue raised on appeal–whether the trial judge erred in admitting evidence of the negligence of subsequent treating physicians and instructing the jury on superseding cause–is moot. They point out how the jury, in finding Dr. Park was non-negligent in his reading of the head CT scan and brain MRI/MRA, never decided whether the negligence of Drs. Blum, Viswanathan, and Alkaitis constituted a "superseding cause" so as to absolve Dr. Park of liability. Therefore, the appellees assert the evidence contested in this appeal is moot because it had no bearing on the jury's verdict, and that even if the trial court admitted this evidence in error, the error was harmless.

On the issue of mootness, we agree with the appellees that, ordinarily, when a jury has found that the defendant did not breach the standard of care, whether the court erred in giving a causation instruction, or in admitting evidence supporting the causation instruction, would be moot. Here, however, the appellants argue that the evidence of negligence by the subsequent treating doctors "contaminated" the jury's consideration of whether Dr. Park breached the standard of care, which is the one issue the jury actually decided. This argument is sufficient to remove any problem with mootness.

Secondarily, the appellees contend the trial court's decision to admit the subject evidence of the two motions *in limine* was proper. They argue it is the province of the jury to weigh evidence and that the jury was free to accept or reject the notion that the negligence of subsequent treating physicians broke the chain of causation between Dr. Park's reading of the radiological images on June 4, 2010, and the acute, and ultimately fatal, stroke Mr. Copsey suffered six days later. The appellees assert this appeal is predominantly motivated by the appellants' taking for granted that the jury would be

9

sympathetic to their unfortunate situation and therefore find in their favor. Ultimately, however, the appellees contend this case came down to a classic "battle of the experts." They argue the jury trusted their experts more than the appellants' because their experts reviewed the CT scan and MRI/MRA images blindly, whereas the appellants' were informed exactly where the abnormalities were before being asked to provide their assessment of whether Dr. Park provided a negligent impression. The appellees assert the jury naturally trusted the experts who viewed the images in the manner Dr. Park would have viewed them over those who viewed the images through the lens of hindsight.

Finally, the appellees contend that superseding cause is a question for the jury as long as the facts admit more than one inference regarding whether unforeseeable intervening acts of negligence occurred. The appellees point to Dr. Blum's failure to follow up on the "urgent" interpretation he requested from the radiology department on June 9, 2010, Dr. Viswanathan's failure to notify a physician of his critical MRI findings until 10:30 p.m. on June 9, 2010, and Dr. Alkaitis' failure to do anything after being notified of Mr. Copsey's possible impending infarct as acts of intervening negligence which a reasonable jury could have determined "unforeseeable." The appellees take this argument one step further. They argue Dr. Park was entitled to demonstrate not only that the negligent acts of Drs. Blum, Viswanathan, and/or Alkaitis were superseding causes, but also that this group of subsequent treating physicians was solely responsible for Mr. Copsey's death. Pursuant to *Martinez*, 212 Md. App. 634, the appellees assert Dr. Park had a right to present evidence of negligence by subsequent treating physicians because he completely denied liability. The appellees contend that if the trial court had precluded this evidence, then the

jury would have been left to assume, based on an incomplete story ending in a patient's death, that Dr. Park was to blame.

## B. Standard of Review

We recently took up the issue of whether evidence of third-party negligence is admissible in medical malpractice actions. *See Martinez*, 212 Md. App. at 661-79. We outlined our standard for reviewing this issue as follows:

> Evidentiary rulings will not be disturbed "absent error or a clear abuse of discretion." *Thomas v. State,* 429 Md. 85, 97, 55 A.3d 10 (2012) (citations omitted). "[A]ll relevant evidence is admissible. Evidence that is not relevant is not admissible." Md. Rule 5–402. Further, the Maryland Rules provide that:
>
>> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
>
> Md. Rule 5–403.
>
> When determinations of relevancy are "the ultimate issue," appellate courts are "generally loath to reverse a trial court[.]" *Tyner v. State,* 417 Md. 611, 616–17, 11 A.3d 824 (2011) (citations omitted). The trial court's consideration of prejudice or confusion of the issues "will be accorded every reasonable presumption of correctness...." *Cure v. State,* 421 Md. 300, 331, 26 A.3d 899 (2011) (citations omitted). Thus, an abuse of discretion exists when the "decision under consideration [is] well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *North v. North,* 102 Md. App. 1, 14, 648 A.2d 1025 (1994). "Trial judges do not, however, have discretion to admit irrelevant evidence." *Schneider v. Little,* 206 Md. App. 414, 447, 49 A.3d 333 (2012), *cert. granted,* 429 Md. 303, 55 A.3d 906 (2012) (citing *State v. Simms,* 420 Md. 705, 724, 25 A.3d 144 (2011)).

*Martinez*, 212 Md. App. at 657-58.

Regarding whether the trial court erred in generating a jury instruction on superseding cause, "[Md. Rule 4-325(c)] 'has been interpreted to require that a requested instruction be given only when there is evidence in the record to support it.'" *Flores v. State*, 120 Md. App. 171, 193 (1998) (quoting *Hof v. State*, 337 Md. 581, 612 (1995)). When reviewing whether the evidence in the record supports a the trial court's decision to generate a certain jury instruction, an appellate court must "determine whether . . . [there exists] that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired." *Bazzle v. State*, 426 Md. 541, 550 (2012) (quoting *Dishman v. State*, 352 Md. 279, 292 (1998)).

### C. Analysis

The crux of Appellant's argument is that Dr. Park could not, as a matter of law, have been absolved of liability by the negligent acts of subsequent treating physicians. We disagree and shall explain.

In *Martinez*, we took up the issue of whether evidence of prior third-party negligence is admissible in a medical malpractice action where the defendant asserts a complete denial of liability. 212 Md. App. 634. The plaintiff, who was ten days overdue for the birth of her first child, "elected to have a natural birth at home[] with the assistance of . . . a registered nurse midwife[.]" *Id.* at 640. She spent over 19.5 hours in labor with her baby's head facing the wrong direction before deciding to go to the hospital. *Id.* at 640-41. Once at the hospital, the attending physicians determined that an "urgent" Caesarean

12

section was required. *Id.* at 642. The baby's "condition at birth was poor," *id.* at 643, and he was ultimately diagnosed with "cerebral palsy, retardation, and other disorders." *Id.* The plaintiff "filed a pre-trial motion *in limine* seeking to exclude testimony regarding. . . Midwife Muhlhan's alleged [negligence]." *Id.* at 645. The trial court granted the plaintiff's motion, reasoning that any negligence possibly committed by the midwife was irrelevant to whether or not the hospital's agents negligently treated the plaintiff upon her arrival. *Id.* at 647-48. We reversed. We held that "evidence of both negligence and causation attributable to a non-party is relevant where a defendant asserts a complete denial of liability[,]" *id.* at 664, and that "the [h]ospital was entitled to try to convince the jury that not only was it *not* negligent and *not* the cause of Martinez's injuries, but that [the midwife] *was* negligent and *did* cause the injuries." *Id.* at 665 (emphasis in original).

The parties to the present case dispute what effect our holding in *Martinez* has on the trial court's decision to admit evidence pertaining to the negligence of Drs. Blum, Viswanathan, and Alkaitis, and understandably so. In *Martinez*, the alleged third-party negligence occurred before the plaintiff presented to the hospital. Here, on the other hand, we have a physician who was permitted to present evidence of negligence by subsequent treating physicians at the same medical center. However, just like the defendant in *Martinez*, Dr. Park, in addition to claiming that Drs. Blum, Viswanathan, and Alkaitis were superseding causes, completely denied liability. Therefore, the reason why evidence of third-party negligence was admissible in *Martinez* applies here as well–because without it, "the jury [would have been] given a materially incomplete picture of the facts, which [would have] denied [Dr. Park] a fair trial." *Id.* at 666. Our holding in *Martinez* that

13

"evidence of both negligence and causation attributable to a non-party is relevant where a defendant asserts a complete denial of liability," *id.* at 664, was unqualified. Therefore, we reject the appellants' argument that because the negligence of Drs. Blum, Viswanathan, and Alkaitis occurred *after* Dr. Park's reading of the MRI/MRA on June 4, 2010, *Martinez* somehow does not apply.

We now turn to whether Dr. Park's alternative defense of superseding cause has any bearing on the admissibility of the contested evidence. We hold that it does not. Likewise, we hold that the trial court did not err in instructing the jury on superseding causation.

The appellants are correct in that "[t]he classic examples of legally foreseeable negligence by treating physicians arose in automobile cases where doctors aggravated, or failed to cure, injuries caused by the negligent driver."[3] The appellants are also correct that this principle has been "extended to failure to diagnose cases . . . where subsequent healthcare providers fail to avoid the harm set in motion by the initial misdiagnosis." However, their assertion that any negligence by Dr. Park in his reading of the MRI/MRA on June 4, 2010, would have rendered him *per se* liable for the subsequent negligence of Drs. Blum, Viswanathan, and Alkaitis is a mischaracterization of the law regarding consecutive tort liability. This is because in cases involving acts of negligence by

---

[3] *See Underwood-Gary v. Mathews*, 366 Md. 660, 668 (2001) (noting that it is a "well-settled principle of tort law that 'a negligent actor is liable not only for harm that he directly causes but also for any additional harm resulting from normal efforts of third persons in rendering aid, irrespective of whether such acts are done in a proper or a negligent manner.'" (quoting *Morgan v. Cohen*, 309 Md. 304, 310 (1987))).

14

subsequent treating physicians, the liability of the initial treating physician can be cut off if subsequent negligence by another physician constitutes a superseding cause.

In *Thomas v. Corso*, 265 Md. 84 (1972), the Court of Appeals held that there was sufficient evidence for the jury to conclude the defendant on-call doctor was negligent when he failed to promptly report to the hospital to treat a patient who had been struck by a car. The on-call doctor defended himself on the grounds that the nurses at the hospital negligently failed to call him back an hour later to tell him that the patient had gone into shock and therefore needed the immediate attention of a doctor. *Id.* at 94. The Court of Appeals, however, held that the undisputed evidence that the on-call doctor was notified that the patient had been struck by a car, had an abrasion on his forehead, and was complaining of numbness in his right thigh was sufficient, notwithstanding the alleged negligence of the nurses, to support the jury's determination that the on-call doctor was liable. *Id.* at 99. *Corso* does not, as the appellants contend, stand for the proposition that a negligent treating physician is liable *per se* for the negligence of subsequent treating physicians. Rather, the Court of Appeals' holding in *Corso* was that the evidence was sufficient to permit the jury's finding that the on-call doctor "was one of the direct and proximate causes of [the patient's] death, concurrent with the negligence of the nurses." *Id.* at 103. Interestingly enough, the defendant doctor in *Corso* was permitted to present testimonial evidence of the nurses' subsequent negligence in an attempt to prove he was not liable. *Id.* at 100-01.

*Mehlman v. Powell*, 281 Md. 269 (1977), is also instructive regarding the present appeal. In that case, the plaintiffs sued a hospital and two of its doctors for negligently

causing the death of a patient. *Id.* at 271-72. The jury returned a verdict against all three defendants, and one of the doctors–Dr. Ruben Cosca–appealed. *Id.* at 272. One of his arguments on appeal was that the trial court erred in denying his motion for directed verdict, in which he argued he was not a proximate cause of the patient's death because his negligence was followed-up by negligent omissions of others. *Id.* at 1124. The Court of Appeals held that the trial court did not err in denying the motion for directed verdict and upheld the jury's finding that the subsequent acts of negligence were not superseding causes exonerating Dr. Cosca from liability. *Id.* The Court did not, however, hold that it is error for a trial court to permit a defendant physician who was the first to allegedly provide negligent treatment to a patient to present evidence of negligence by subsequent treating physicians.

We agree with the appellees that Dr. Park was entitled to pursue the superseding cause defense, and thus to present evidence of negligence by Drs. Blum, Viswanathan, and Alkaitis. "It is well established that, 'unless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury.'" *Pittway Corp. v. Collins*, 409 Md. 218, 253 (2009) (quoting *Caroline v. Reicher*, 269 Md. 125, 133 (1973)). A superseding cause is said to have "arise[n] primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Pittway*, 409 Md. at 249. We have also noted that

> Section 442 of the Restatement (Second) of Torts, which reads as follows, establishes the test that has been applied in Maryland courts for determining when an intervening negligent act rises to the level of a superseding cause:

16

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* at 248.

Applying this test to the case at bar, it is clear that the trial court did not err. The evidence of negligence by Drs. Blum, Viswanathan, and Alkaitis was relevant to whether Dr. Park was a proximate cause of Mr. Copsey's death. Furthermore, the negligent acts committed by subsequent treating physicians on June 9, 2010, met the "minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the [superseding cause defense]."

17

*Bazzle*, 426 Md. at 550 (quoting *Dishman*, 352 Md. at 292). Therefore, just as the court did not err in admitting the evidence of subsequent negligent acts, nor did it err in generating the superseding cause instruction.

While no Maryland case is completely indistinguishable from the case at bar, we find guidance in cases from other jurisdictions such as *Siggers v. Barlow*, 906 F.2d 241 (6th Cir. 1990). In that case, Dr. Barlow negligently misread x-rays that revealed a severely fractured wrist on July 27, 1986. *Id.* at 242. Later that same day, a radiologist caught the mistake. *Id.* The radiologist's written report was sent to the emergency room on August 1, 1986, but the physician on duty at that time failed to notify the patient. *Id.* at 243. On September 8, 1986, the patient reported back to the emergency room when the pain in his wrist became "unbearable." *Id.* Surgery was subsequently performed, but not within the "undisputed . . . post-injury 'window' period of about 7 to 14 days during which time [permanent wrist damage could have been prevented]." *Id.* The jury returned a verdict in favor of the patient, but the trial court subsequently granted Dr. Barlow's motion for judgment notwithstanding the verdict, and the Sixth Circuit affirmed. *Id.* at 243, 248. In doing so, the Court explained that

> [a]lthough the risk of harm to [the patient] as created by Dr. Barlow's initial misdiagnosis was great, this risk of harm did not materialize until 7 to 14 days after the injury occurred. Up until this post-injury window period closed, surgery could have been performed on the wrist to restore it to virtually its previous normal condition. An adequate amount of time thus existed for Dr. Robertson to notify [the patient] of the misdiagnosis before the risk of harm reached an emergency stage (*i.e.,* before the risk of harm became a resulting harm).

18

*Id.* at 245. We reference this case merely as additional support for our holding that the trial court in this case did not err in admitting evidence of negligence by subsequent treating physicians nor in generating the superseding cause instruction. Where the facts admit more than one inference, the determination of superseding causation is best left to the jury.

We, therefore, hold that the circuit court did not err in admitting evidence pertaining to the negligence of subsequent treating physicians. Furthermore, we uphold the jury's verdict in favor of the appellee and affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**