*Jenny J. Copsey, Individually, and as Personal Representative of the Estate of Lance D. Copsey, Deceased, et al. v. John S. Park, et al.*, No. 34, September Term, 2016. Opinion by Greene, J.

**NEGLIGENCE—NON-PARTY EVIDENCE:** The Court of Appeals held that under Maryland law, when a defendant generally denies liability in a negligence action the defendant may present evidence of a non-party's negligence and causation in his or her defense. *Martinez ex rel. Fielding v. Johns Hopkins Hosp.*, 212 Md. App. 634, 664, 70 A.3d 397, 414 (2013). The petitioners moved *in limine* to exclude all evidence relating to the subsequent treating physicians' prior statuses as defendants or pre-trial settlements of claims against them, in this case, because they were no longer parties to the litigation. In addition, the petitioners sought to preclude Dr. Park and his employer, the only remaining party-defendants, from raising as a defense that the negligence of the subsequent treating physicians was a superseding cause of the patient's death. We hold that although the petitioners argue that permitting evidence of the non-parties' negligence and causation would prejudice the jury in not finding the defendant negligent, evidence of the non-parties' negligence was relevant and necessary in providing the defendant doctor and his employer a fair trial. This evidence tended to show that Dr. Park was not negligent. Accordingly, the alleged prejudice did not outweigh its probative value.

**NEGLIGENCE—SUPERSEDING CAUSE:** Intervening action breaks the chain of causation when the intervening act by a third party is extraordinary and not reasonably foreseeable by the allegedly negligent party. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 160–61, 642 A.2d 219, 232 (1994). Ultimately, it is for a jury to determine whether an intervening act of a third party was a superseding cause of the injury. We note that the allegedly negligent doctor and his employer in this action presented evidence that the doctor's conduct did not fall below the standard of care and, moreover, three subsequent treating physicians, who were no longer parties to the case at bar, negligently treated the patient six days later and the evidence tended to show that the negligence of those doctors was the proximate cause of the patient's death. Further, causation was an issue for the jury to determine and there was sufficient evidence for a reasonable jury to conclude that the first doctor to treat the patient was not negligent.

Circuit Court for Anne Arundel County
Case No. 02-C-13-178530
Argued: December 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 34

September Term, 2016

_____

JENNY J. COPSEY, Individually and as
Personal Representative of the Estate of
LANCE D. COPSEY, Deceased, et al.

v.

JOHN S. PARK, et al.

_____

Barbera, C.J.
Greene,
McDonald,
Watts,
Hotten,
Getty,
Rodowsky, Lawrence F., (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Greene, J.

_____

Filed: May 24, 2017

In this case, Jenny J. Copsey, the widow of Lance D. Copsey, individually and as the personal representative of the Estate of Lance D. Copsey, deceased, along with the minor children and mother of the decedent are the petitioners. They allege that the respondents, John S. Park, M.D. ("Dr. Park") and his employer, Brown, Croft and Frazier, P.A. ("Annapolis Radiology"), were negligent when Dr. Park interpreted radiological images on June 4, 2010, leading to Lance D. Copsey's ("Mr. Copsey") fatal stroke on June 10, 2010. Initially, the petitioners sued Dr. Park and three subsequent treating physicians, along with their employers. Prior to trial, however, the petitioners partially settled their claims and dismissed two of the doctors and their employer. A day after trial had begun, the petitioners also dismissed the remaining subsequent treating physician. The trial judge denied the petitioners' motions *in limine* which opposed the admission of evidence regarding the non-parties' statuses as former defendants and Dr. Park's raising the defense that the negligence of subsequent treating physicians was an intervening and superseding cause of Mr. Copsey's death.

We shall hold that evidence of non-party negligence was relevant and necessary in providing Dr. Park a fair trial as it tended to show he was not negligent; thus, the alleged prejudice did not outweigh its probative value. Further, causation was an issue for the jury to determine and Dr. Park presented sufficient evidence for a reasonable jury to conclude that he was not negligent; and if found to be negligent, his negligence was superseded by the independent and extraordinary negligence of others. Accordingly, we shall affirm the judgment of the Court of Special Appeals which held that both of the motions *in limine* were properly denied because the *Martinez* case permits the introduction into evidence of

non-party negligence and causation. *Martinez ex rel. Fielding v. Johns Hopkins Hosp.*, 212 Md. App. 634, 70 A.3d 397 (2013).

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Copsey had several risk factors for stroke including moderate obesity, hypercholesterolemia,[1] hypertension, and a smoking habit. On February 4, 2010, Mr. Copsey was presented to the Anne Arundel Medical Center ("AAMC") emergency room after slipping, falling, and hitting the back of his head while playing racquetball. He complained of nausea and a headache. The hospital released him after treatment and a reportedly normal cranial CT scan.

Three months later, on May 26, 2010, Mr. Copsey returned to the AAMC emergency room. He complained of recurring episodes of dizziness since the morning of May 26. Another CT scan revealed normal results. He was referred to his internal medicine physician, Aditya Chopra, M.D. ("Dr. Chopra"), for a follow-up appointment.

On June 1, 2010, Mr. Copsey saw Dr. Chopra. Mr. Copsey complained of difficulty walking, nausea, headaches, and persistent vertigo. Dr. Chopra prescribed a generic brand of Dramamine and antibiotics and suggested Mr. Copsey consult an ophthalmologist and, if the symptoms did not improve, also advised him to see an ear, nose, and throat doctor. Mr. Copsey did meet with an ophthalmologist, on June 2, 2010, who determined there was

---

[1] "Hypercholesterolemia is a condition characterized by very high levels of cholesterol in the blood." *Your Guide to Understanding Genetic Conditions: Hypercholesterolemia*, U.S. NATIONAL LIBRARY OF MEDICINE (March 2007), https://ghr.nlm.nih.gov/condition/hypercholesterolemia.

no ophthalmological etiology for his diplopia[2] and recommended a neurologic consultation and a neuroradiologic evaluation.

On June 4, 2010, Mr. Copsey returned to see Dr. Chopra who performed both of the recommended neurological assessments and found signs of neurological problems and thus advised Mr. Copsey to return to the emergency room for immediate attention. On that afternoon, Mr. Copsey returned to the AAMC emergency room. He told Charles Iliff, M.D. ("Dr. Iliff"), that he had vertigo occurring for about a week, numbness in the right side of his face, right arm, and right leg, headaches, mild shortness of breath, mild diplopia, and trouble walking. Dr. Iliff's examination of Mr. Copsey was normal, but after consulting with a neurologist, Larry Blum, M.D. ("Dr. Blum"), a CT scan and a brain MRI/MRA[3] were conducted.

On the same date, a radiologist, Dr. Park, interpreted the CT scan at 4:02 p.m. and the MRI/MRA at 6:45 p.m. Dr. Park reported an allegedly normal CT scan and MRI/MRA. Specifically, he found:

> There is no evidence of acute intracranial hemorrhage, infarction, mass effect, or midline shift. No abnormal extraaxial fluid collections are identified. The ventricles, sulci, and cisterns are normal. There is no acute injury to the skull base or calvarium.

---

[2] Diplopia is commonly referred to as double vision. *Double Vision (Diplopia)*, HARVARD HEALTH PUBLICATIONS: HARVARD MEDICAL SCHOOL, http://www.health.harvard.edu/childrens-health/double-vision-diplopia- (last visited May 9, 2017).

[3] An MRI is magnetic resonance imaging and an MRA is magnetic resonance angiography. "[T]hese procedures use a magnetic field, radio waves and a computer to create detailed images . . . use[d] to distinguish normal, healthy tissue from diseased tissue." *Head MRI MRA MRV*, CEDARS-SINAI, https://www.cedars-sinai.edu/Patients/Programs-and-Services/Imaging-Center/For-Patients/Exams-by-Procedure/MRI/Head-MRI-MRA-MRV.aspx (last visited May 11, 2017).

There is normal anatomy of the circle of Willis with no evidence of aneurysm, anteriovenous malformation, or abnormal vessel cut-off. No hemodynamically significant stenosis is identified. Incidental note is made of fenestration of the left vertebral artery.

There is no evidence of acute intracranial hemorrhage, infarction, mass effect, or midline shift. No abnormal extraaxial fluid collections are identified. The ventricles, sulci, and cisterns are normal. The flow voids at the skull base are normal. There is no acute injury to the skull base or calvarium.

On June 5, 2010, Dr. Blum independently reviewed the MRI and MRA images after Dr. Park and also confirmed there were no abnormalities. Dr. Blum believed Mr. Copsey's symptoms were merely evidence of migraines. Mr. Copsey was discharged on June 6, 2010, and diagnosed with migraines, cluster migraines, vertigo, hypercholesterolemia, mildly elevated blood pressure, and hypertension; his discharge summary indicated he was "otherwise doing fine."

On June 7, 2010, Mr. Copsey was seen by Dr. Chopra for outpatient evaluation. Mr. Copsey indicated he had no chest pain, dizziness, shortness of breath, cough, nausea, vomiting, diarrhea, constipation, aches or pains, headache, or burning urination. Dr. Chopra noted that Mr. Copsey had no neurological issues and told him to go back to the emergency room or follow-up with Dr. Blum if his symptoms returned. His symptoms did return towards the end of the day, but he did not return to see Dr. Blum at AAMC for a follow-up evaluation until June 9, 2010.

At the follow-up, Mr. Copsey stated that his symptoms, including diplopia and headaches, had returned and that he had begun experiencing hiccups and trouble swallowing. Mr. Copsey's neurological exam was normal, but the new symptoms

concerned Dr. Blum. Thus, he ordered an urgent interpretation of a new brain MRI, writing "*STAT*" on the order form and telling Mr. Copsey to return to him with the results. Dr. Blum's requisition to the radiologist specified an urgent call back from the radiologist. Vijay Viswanathan, M.D. ("Dr. Viswanathan"), in the radiology department, interpreted the MRI at 4:02 p.m. and noted:

> 1. Ill-defined new band-like signal abnormality within the right lateral medulla which is nonspecific but is concerning for acute infarction. This is a new finding since the prior study dated June 4, 2010.
> 2. This could be suggestive of lateral medullary syndrome/Wallenberg syndrome.
> 3. Left vertebral artery abnormal flow void which is nonspecific. It is difficult to appreciate the connection between right medullary abnormality and left vertebral artery abnormality. Clinical correlation advised.
> 4. No evidence of intraorbital pathology.
> I discussed these findings with Dr. Alkaitis, covering physician for Dr. Blum at 1030 p.m., 6-9-10.

An "infarction" is brain-cell death caused by insufficient flow of blood. Dr. Viswanathan dictated the report at 4:42 p.m., but it was not until 10:30 p.m. that Dr. Viswanathan notified the on-call neurologist, Damanhuri Alkaitis, M.D., ("Dr. Alkaitis") of the findings. Dr. Viswanathan did not report these results to Dr. Blum, as he was asked to do, or anyone else at AAMC or to Mr. Copsey.

Mr. Copsey returned to see Dr. Blum around 6 p.m. with the images. In his report, Dr. Blum reflected that the radiology department never called him despite his request for an urgent call back. However, Dr. Blum could have accessed Dr. Viswanathan's findings earlier by checking the Medical Center's computer database or by contacting the radiology department. He reviewed the images himself and found no abnormalities. Thus, Dr. Blum released Mr. Copsey from the hospital. Mr. Copsey had already been released by the time

Dr. Viswanathan notified Dr. Alkaitis of the MRI results at 10:30 p.m. Mr. Copsey was not informed that a lateral medullary infarct had been discovered nor did Dr. Viswanathan or Dr. Alkaitis take any action in contacting Mr. Copsey, his family, or arranging for an ambulance to transport Mr. Copsey back to the hospital emergency room for treatment that night.

On June 10, 2010 at approximately 4:00 a.m., Mr. Copsey suffered a stroke when he woke up to use the bathroom. His wife took him to the AAMC emergency room after she found him on the floor of their home unable to get up. A CT scan conducted at approximately 6:07 a.m. revealed a right medullary hypodensity, reflective of an acute stroke.

Mr. Copsey's condition worsened by approximately 11:00 a.m. He was then transferred to Johns Hopkins Hospital ("JHH"). JHH diagnosed Mr. Copsey with bilateral vertebral dissections; multiple acute brainstem and cerebellar strokes; hyperlipidemia; and head trauma from the racquetball fall in February.

On June 12, 2010, Mr. Copsey underwent angioplasty and received a stent in his right vertebral artery. However, the following day he became unresponsive. After treatments failed, Mr. Copsey's condition continued to deteriorate. He died on June 13, 2010.

The petitioners filed survival and wrongful death actions on September 27, 2011, in the Circuit Court for Anne Arundel County against Dr. Park and Annapolis Radiology, Dr. Viswanathan and his employer, Anne Arundel Diagnostic Imaging, Inc., and Dr. Blum and Dr. Alkaitis, and their employer, Bay Area Neurology, LLC ("Bay Area"). According to

the petitioners, between June 4 and June 10, each doctor involved in the treatment negligently failed to timely diagnose Mr. Copsey's evolving stroke. They sought to hold all of the doctors involved jointly and severally liable for the death of Mr. Copsey. The petitioners reached pre-trial settlements with the defendants, Dr. Blum, Dr. Alkaitis, and Bay Area Neurology. Those defendants were dismissed from the action. On September 17, 2014, a day after the trial had begun, the petitioners voluntarily dismissed Dr. Viswanathan and his employer, Anne Arundel Diagnostic Imaging, Inc. Thus, Dr. Park and his employer, Annapolis Radiology, were ultimately the only defendants left in the case to stand trial.

On August 26, 2014, the petitioners moved *in limine*, to prevent introduction of certain evidence, prior to trial. The first motion was to exclude all evidence relating to Dr. Blum's and Dr. Alkaitis' prior statuses as defendants and the pre-trial settlements. The second was to preclude Dr. Park from raising as a defense that the negligence of subsequent treating physicians was an intervening and superseding cause of Mr. Copsey's alleged injuries. After hearing arguments from both parties on the first day of trial, the Honorable Paul G. Goetzke, presiding, denied both of the motions.[4]

**Trial**

---

[4] Although the motions, as filed, did not involve Dr. Viswanathan because he was still a party to the case at the time of the filing, both parties made it clear, during trial, that evidence relating to Dr. Viswanathan's negligence was also being argued, just as the other two doctors. In fact, petitioners' attorney, at trial, argued several times that evidence of each of the three doctors, including Dr. Viswanathan, should be excluded as they were all non-parties and evidence of their negligence could prejudice the jury. Thus, just as the parties do, we will apply our discussion of *Martinez* and the negligence of non-parties to all three subsequent treating physicians.

- 7 -

Prior to trial, the petitioners' attorney wrote a letter to their expert witness, Dr. Caren Jahre ("Dr. Jahre"), a radiologist/neuroradiologist, discussing all of Mr. Copsey's history, the studies performed, his symptoms, and the cause of death. The respondents suggested that Dr. Adam Hecht ("Dr. Hecht"), a neurologist and Dr. Jahre's partner, may have read this letter, but Dr. Hecht testified at trial that he could not recall whether or not he had read the letter. Moreover, Dr. Jahre indicated in her *de bene esse* deposition testimony that she could not recall if she looked at the letter before her review, but also stated that she *only* does blind reviews when an attorney directs it, which was not done here, and that she did know in advance of conducting her review to look for vertebral artery occlusions. Dr. Hecht and Dr. Jahre testified that the June 4 MRA showed abnormalities in the left vertebral artery ("LVA") and the right vertebral artery ("RVA"), which should have been detected by Dr. Park.

A defense witness, Dr. Susan O'Sullivan ("Dr. O'Sullivan"), a radiologist, pointed out that an objective blind review is meant to prevent bias from a hindsight review where a radiologist knows exactly what to look for when reviewing a study.[5] Two of the defense experts, Dr. Alan Hyman ("Dr. Hyman") and Dr. O'Sullivan, conducted blind reviews and did not notice any problems or abnormalities that went unnoticed by Dr. Park. Dr. Hyman,

---

[5] Dr. O'Sullivan stated:

> [B]lind review is meant to review -- to reduce or exclude any type of bias knowing what's there when you are looking at the study. So it's a true way of actually looking at it when -- as if you were in your regular practice and reviewing it in a very objective manner. . . . [T]here is a hindsight bias known in radiology and by radiologists whereby once you know something is there it's a lot easier to see than if you're looking at it prospectively.

an assistant clinical professor of neuroradiology at Mt. Sinai Medical School, found the MRI/MRA, including the LVA and RVA, from the June 4 results to be normal. Both of the defense experts concluded that Dr. Park had acted within the standard of care.

Michael Horowitz, M.D. ("Dr. Horowitz"), a neurosurgeon and the petitioners' causation expert, testified that if Dr. Blum, Dr. Alkaitis, or Dr. Viswanathan had obtained medical attention for Mr. Copsey on June 9, one day before his stroke, the stroke could have been prevented. Guy Rordorf, M.D. ("Dr. Rordorf"), an expert witness for the petitioners, also testified that had Dr. Blum, Dr. Viswanathan, and Dr. Alkaitis given Mr. Copsey medical attention on June 9, his major stroke on June 10 would have been avoided and his life saved. Further, expert witnesses on both sides testified regarding the negligence of all three of the subsequent treating doctors in their care of Mr. Copsey:

**Dr. Blum:** Expert witnesses opined that Dr. Blum's treatment of Mr. Copsey was below the standard of care. Dr. Rordorf testified that Dr. Blum was negligent on June 9 when he reviewed the MRI results on his own, did not wait for the STAT test results he had ordered from the radiology department, and sent Mr. Copsey home. Dr. Rordorf noted that Mr. Copsey presented symptoms of stroke which should have been apparent. Another one of the petitioners' witnesses, Dr. Horowitz, stated that a reasonable neurologist would have acted to treat Mr. Copsey's symptoms immediately. As to June 4, Dr. Owen Samuels ("Dr. Samuels"), the respondents' witness, testified that it was not reasonable for Dr. Blum to rely solely on Dr. Park's interpretations of the MRI/MRA on June 5 because a stroke is a clinical diagnosis and Mr. Copsey was exhibiting apparent stroke-like symptoms.

**Dr. Viswanathan:** Despite receiving notice from Dr. Blum to contact him, Dr. Viswanathan did not contact Dr. Blum after Dr. Viswanathan obtained the radiology scans on June 9 shortly after 4:00 p.m. He only contacted Dr. Alkaitis, who was substituting for Dr. Blum, six hours later that night, after Mr. Copsey had already been released by Dr. Blum. Dr. Hecht stated that Dr. Viswanathan's actions fell below the standard of care for a treating radiologist and every effort should have been made to contact the patient's physician immediately after discovering these alarming results.

**Dr. Alkaitis:** Dr. Hecht also testified that Dr. Alkaitis' conduct fell below the standard of care for a physician when he received news of Mr. Copsey's condition from Dr. Viswanathan at 10:30 p.m. on the night of June 9, but did not take further action. Dr. Rordorf testified that he was surprised that Dr. Alkaitis did nothing because it is the responsibility of a neurologist in such a situation to call the patient to let them know of a critical MRI finding. Further, Dr. Rordorf indicated that Dr. Alkaitis should have had the patient rushed to the emergency room and should have called the emergency room to notify them that a patient with a stroke would be coming in for emergency treatment. Dr. Rordorf testified that such treatment would have saved Mr. Copsey's life.

The case was tried before a jury from September 16, 2014 through September 24, 2014. On September 24, 2014, the jury returned a verdict in favor of the defendant, Dr. Park. The jury found that Dr. Park did not breach the standard of care and acted as a reasonable physician under the circumstances. The petitioners filed a timely appeal. The Court of Special Appeals affirmed the Circuit Court as explained in its opinion filed on May 31, 2016. The intermediate appellate court applied *Martinez* to uphold the

introduction of evidence of a non-party's negligence and causation. *Copsey v. Park*, 228 Md. App. 107, 121, 137 A.3d 299, 307 (2016). In addition, the court held that a reasonable jury could have found that the negligence of the subsequent treating physicians were both intervening and superseding causes contributing to Mr. Copsey's death. 228 Md. App. at 124, 134 A.3d at 309.

Jenny J. Copsey, et al. filed a petition for writ of certiorari in this Court. We granted certiorari to answer the following questions:

1. Did the trial court err in admitting evidence of the negligence of non-party, subsequent treating physicians, including evidence that they were once defendants in the instant suit?

2. Did the trial court err in instructing the jury on superseding cause when the negligence of all the treating physicians amounted to one indivisible injury, that being death?

*Copsey v. Park*, 449 Md. 408, 144 A.3d 704 (2016).

We answer each question in the negative and hold that a defendant generally denying liability may present evidence of a non-party's negligence and causation as an affirmative defense. It was not error to admit evidence of the negligence of the non-party subsequent treating physicians. Evidence of a non-party's negligence was relevant and necessary in providing Dr. Park a fair trial; the potential prejudice did not outweigh the probative value of the evidence. We further hold that causation was an issue for the jury to determine. The evidence presented by Dr. Park tended to show that he was not negligent and that if he were negligent, the negligent omissions of the other three subsequent treating physicians were intervening and superseding causes of the harm to the patient. Therefore, we shall affirm the judgment of the Court of Special Appeals.

- 11 -

**STANDARD OF REVIEW**

We have held that "on review, we will not disturb the trial court's evidentiary rulings absent error or a clear abuse of discretion." *Thomas v. State*, 429 Md. 85, 97, 55 A.3d 10, 17 (2012) (citations omitted). "Such exercise of discretion will be accorded every reasonable presumption of correctness and will not be upset except in a clear case of abuse." *Cure v. State*, 421 Md. 300, 331, 26 A.3d 899, 917 (2011) (citations and internal quotation marks omitted).

Further, the Maryland Rules provide that "all relevant evidence is admissible. Evidence that is not relevant is not admissible." Md. Rule 5–402. Moreover, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403.

> At the outset, we note that the admission of evidence is committed to the considerable and sound discretion of the trial court. In that regard, all relevant evidence is generally admissible. A corollary to that rule is that irrelevant evidence is not admissible. Md. Rule 5–402. To be relevant, evidence must tend to establish or refute a fact at issue in the case. Md. Rule 5–401. Once a finding of relevancy has been made, we are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion.

*Merzbacher v. State*, 346 Md. 391, 404–05, 697 A.2d 432, 439 (1997) (citations omitted).

**DISCUSSION**

The petitioners contend that by admitting the evidence of the non-parties' negligence, and denying both of the motions *in limine*, the trial court admitted evidence which was irrelevant and immaterial to the issue of whether Dr. Park violated the standard

- 12 -

of care in his treatment and whether that breach was a proximate cause of Mr. Copsey's death. The evidence also deflected, according to the petitioners, the jury's attention from Dr. Park's performance and injected notions into the consciousness of the jurors that the "guilty" parties had once been defendants who had settled and therefore Dr. Park must not have been negligent. The petitioners also assert that the judgment of the Court of Special Appeals should be reversed because the *Martinez* decision requires review by this Court as well as the improper application of the doctrine of intervening and superseding causes in the context of a medical negligence action involving acts of multiple concurrent tortfeasors. Petitioners argue that each of the physicians contributed to the six-day delay that proximately caused Mr. Copsey's death. In other words, their delay worked, in conjunction with one another, to cause Mr. Copsey's death and thus they are jointly and severally liable. The petitioners maintain that if Dr. Park had diagnosed Mr. Copsey's evolving stroke on June 4, 2010, and referred him for appropriate treatment, it is more probable than not that he would not have died. Further, the petitioners maintain that the subsequent negligence of the other physicians, Dr. Blum, Dr. Viswanathan, and Dr. Alkaitis, in also failing to timely diagnose and treat Mr. Copsey's condition was foreseeable and was not the superseding cause of Mr. Copsey's death.

The respondents, on the other hand, contend that admitting the evidence sought to be excluded by the two motions *in limine* was proper. They posit that it is the authority of the jury to weigh evidence and make the determination of superseding causation. Moreover, the negligence of the other doctors between June 9-10 broke the chain of causation between Dr. Park's reading of the radiological images on June 4 and the stroke

Mr. Copsey suffered on June 10. Further, they argue that under the guise of preventing a "distraction" the petitioners want a rule that gives them veto power over Dr. Park's defense. Moreover, under a "battle of the experts" theory, the respondents indicate that the jury found Dr. Park's expert witnesses more credible because their experts reviewed the CT scan and MRI/MRA images blindly, whereas petitioners' experts were informed of where to locate abnormalities before making an assessment of whether Dr. Park was negligent in his reading of the results. A jury, the respondents maintain, would be more likely than not to find it more trustworthy when experts view the images in the same manner that Dr. Park would have, versus experts who view the images through bias. Finally, according to the respondents, the extraordinary failures of the three subsequent physicians (two neurologists and one radiologist), each of whom failed to avert Mr. Copsey's impending major stroke just hours before it occurred, despite knowing the acute risk, superseded any alleged error by Dr. Park which had occurred days earlier. They assert that the sequential subsequent negligence of these three doctors, Dr. Blum, Dr. Viswanathan, and Dr. Alkaitis, was astonishing and unforeseeable because Dr. Park could not have anticipated that three subsequent treating doctors, not relying on his report, would all act below the standard of care.

### Motion *in Limine*: Prohibiting Dr. Park from Presenting Evidence Relating to Dr. Blum's and Dr. Alkaitis' Prior Statuses as Defendants or Pre-trial Settlements

*Martinez* was the first Maryland decision to address a non-party's negligence in a medical malpractice action and held that evidence of a non-party's negligence should not be excluded in a medical injury case. 212 Md.App. at 663, 666, 70 A.3d at 413, 415. In

*Martinez*, the Court of Special Appeals discussed the admissibility into evidence of a prior third-party's negligence when the defendant generally denies liability. 212 Md.App. at 665, 70 A.3d at 414. Ms. Fielding, the plaintiff pregnant woman who sued on behalf of her baby, Enzo Martinez, was ten days overdue and chose to have a natural birth with the assistance of a registered nurse midwife. 212 Md. App. at 640, 70 A.3d at 400. The baby was occiput posterior (instead of facing forward, the baby was facing inward towards the mother's spine) and Ms. Fielding was in labor for over 19.5 hours before the midwife eventually called an ambulance. 212 Md. App. at 640–41, 70 A.3d at 400–01. Throughout that time, the midwife applied fundal pressure, injected the plaintiff multiple times with Pitocin ("a hormone that increases the strength and frequency of contractions"), performed an episiotomy, and had the plaintiff cleanse herself with a probiotic treatment as an alternative to antibiotics. *Id.* The hospital physicians determined that an "urgent" Caesarean section, rather than an "emergency" Caesarean section, needed to be performed.[6] 212 Md. App. at 642, 70 A.3d at 401. The baby was not delivered in good health and was diagnosed with cerebral palsy, retardation, and other disorders. 212 Md. App. at 643, 70 A.3d at 402.

The plaintiff sued the hospital and "filed a pre-trial motion *in limine* seeking to exclude testimony regarding . . . Midwife Muhlhan's alleged [negligence]." 212 Md. App.

---

[6] Ms. Fielding argued that the "Hospital should have converted to an emergency Caesarean section based on the status of [Ms. Fielding's baby's] fetal heart rate monitor" rather than performing an "urgent" Caesarean which is not performed as quickly as an "emergency" Caesarean, thus, preventing the baby from being properly oxygenated and causing injury. *Martinez*, 212 Md. App. at 644, 70 A.3d at 402.

- 15 -

at 645, 70 A.3d at 403. The trial court granted the motion and reasoned that any negligence that may have been committed by the midwife, a non-party, was not relevant to the hospital's negligence in treating the plaintiff once she arrived. 212 Md. App. at 647–48, 70 A.3d at 405. The Court of Special Appeals reversed and held that "evidence of both negligence and causation attributable to a non-party is relevant where a defendant asserts a complete denial of liability" and "the [h]ospital was entitled to try to convince the jury that not only was it not negligent and not the cause of [baby] Martinez's injuries, but that [the midwife] was negligent and did cause the injuries." 212 Md. App. at 665, 70 A.3d at 414–15 (italics omitted). In fact, the court held that the Hospital was denied a fair trial in not being able to present evidence of the negligent non-party (testimony as to what the standard of care was for the midwife and that there was a breach of that standard). 212 Md. App. at 658, 679, 70 A.3d at 411, 423 ("In our view, the jury was provided a materially incomplete picture, and the Hospital was unnecessarily constrained in presenting its defense that Midwife Muhlhan was the sole cause of [baby] Martinez's injuries. Accordingly, we hold that the error here had a substantial likelihood of causing an unjust verdict."). The court also stated:

> [Ms. Fielding] argues that even if the evidence at issue is deemed relevant, the probative value is "vastly outweighed by potential for unfair prejudice, confusion of the issues, and waste of time. . . ." We disagree. Indeed, the probative value of the evidence of the midwife standard of care, and Midwife Muhlhan's breach of that standard of care, if any, during her treatment of Ms. Fielding, outweighs any potential for unfair prejudice, confusion, or waste of time.

*Martinez*, 212 Md. App. at 672–73, 70 A.3d at 419.

The petitioners argue that *Martinez* does not apply here because the negligence in that case was antecedent and the issue of superseding cause was not involved. It is true that in *Martinez*, the alleged negligence by the midwife, the non-party, preceded the hospital's alleged negligence. Ultimately, however, the issues involved in *Martinez* dealt with a defendant presenting evidence of a non-party's negligence and causation similar to the issues in the case at bar. Subsequent superseding events on June 9-10 followed Dr. Park's alleged negligence and were classic intervening events that Dr. Park could not have reasonably foreseen. Dr. Park was able to present evidence of the negligence of the other treating physicians at the same hospital. Similarly, in addition to claiming that the other treating physicians were superseding causes, Dr. Park also completely denied any liability. Not unlike *Martinez*, evidence of a third-party's negligence is admissible because without the evidence "the jury [would have been] given a materially incomplete picture of the facts, which [would have] denied [Dr. Park] a fair trial." 212 Md.App. at 666, 70 A.3d at 415.

The petitioners also argue that allowing the defendants to point the finger at non-parties will distract the jury and a jury may speculate that the actual "guilty" parties who were once part of the case settled with the injured party and left the "innocent" party to stand alone. However, as the respondents note, this point of view ignores the fact that a jury may also speculate that an "innocent" party settled for a low figure, while a "guilty" party decided to remain and go to trial. We do not believe these concerns have merit because the issues of liability and damages are matters left to the considered determination of the trier of fact. The trier of fact takes into consideration all of the relevant and material evidence in the case and determines the weight to be given to that evidence. In addition,

- 17 -

upon request, the trial judge may give cautionary instructions to the jury as needed to allay either parties' fears that the jurors would be prone to speculation. *See E. Shore Pub. Serv. Co. v. Corbett*, 227 Md. 411, 429, 177 A.2d 701, 711 (1962) (holding that, upon request by a party, a cautionary instruction should be given to the jury to avoid an improper inference and prejudice). *See also* Md. Rule 5-105 ("When evidence is admitted that is admissible as to one party or for one purpose but not admissible as to another party or for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.")

Moreover, this Court has allowed defendants to point to non-party negligence in other circumstances. *ACandS, Inc. v. Asner*, 344 Md. 155, 686 A.2d 250 (1996), involved a products liability action against manufacturers and suppliers of asbestos-containing products. In that case we stated:

> A factual defense may be based on the negligible effect of a claimant's exposure to the defendant's product, or on the negligible effect of the asbestos content of a defendant's product, or both. In such a case the degree of exposure to a non-party's product and the extent of the asbestos content of the non-party's product may be relevant to demonstrating the non-substantial nature of the exposure to, or of the asbestos content of, the defendant's product. But, a defendant would not ordinarily generate a jury issue on lack of substantial factor causation only by showing the dangerousness of a non-party's product to which the claimant was exposed. Ordinarily a defendant would have to follow up the evidence of exposure to the products of non-parties with evidence tending to prove that the defendant's product was not unreasonably dangerous or was not a substantial causal factor. Under these circumstances the proposition that the defendant's product is not a substantial cause may be made more probable by evidence tending to prove that the claimant's disease was caused by the products of one or more non-parties.

*Asner*, 344 Md. at 176–77, 686 A.2d at 260. *See also Reiter v. ACandS, Inc.*, 179 Md. App. 645, 665, 947 A.2d 570, 582 (2008) (holding manufacturer of asbestos fiber-releasing crane brake lining at a mill was not the substantial factor in causing a worker's fatal lung cancer as it was not the exclusive supplier of such asbestos fiber-releasing brakes. "While Square D crane brakes may have been used in the tin mill, there was no testimony that Square D was the exclusive supplier of crane brakes in that mill. Indeed, there were approximately a dozen different manufacturers' crane brake assemblies used in the various Sparrows Point facilities."), *aff'd sub nom. Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 8 A.3d 725 (2010). In the case at bar, as we will discuss, Dr. Park not only presented evidence regarding the negligence of the non-parties, but also offered evidence tending to prove he did not act unreasonably. Ultimately, the jury concluded that Dr. Park did not breach the standard of care and did in fact act as a reasonably competent physician in the same or similar circumstances.

**Motion *in Limine*: Precluding Dr. Park from Raising the Defense that Negligence of the Subsequent Treating Physicians was an Intervening and Superseding Cause**

The elements of negligence are well established in this state. "First, the defendant must be under a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure." *Lamb v. Hopkins*, 303 Md. 236, 241, 492 A.2d 1297, 1300 (1985). Thus, in order to be found negligent, the negligence of the individual(s) must be a proximate cause of the alleged harm. *Stone v. Chicago Title Ins. Co. of Md.*, 330 Md. 329, 337, 624 A.2d 496, 500 (1993).

> Proximate cause ultimately involves a conclusion that someone will be held legally responsible for the consequences of an act or omission. This determination is subject to considerations of fairness or social policy as well as mere causation. Thus, although an injury might not have occurred "but for" an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury.

*Peterson v. Underwood*, 258 Md. 9, 16, 264 A.2d 851, 855 (1970).

This Court in *Pittway* noted that in order to be a proximate cause of an injury, the negligence must both be (1) a cause in fact, and (2) a legally cognizable cause. *Pittway Corp. v. Collins*, 409 Md. 218, 243–45, 973 A.2d 771, 786–87 (2009). Cause-in-fact involves an inquiry of whether a defendant's actions actually produced an injury. *Pittway*, 409 Md. at 244, 973 A.2d at 786. "When two or more independent negligent acts bring about an injury . . . the substantial factor test controls. Causation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Pittway*, 409 Md. at 244, 973 A.2d at 787 (citations and internal quotation marks omitted). We have adopted the substantial factor test from the Restatement (Second) of Torts. *See id.*; *Eagle-Picher Indus., Inc. v. Balbos*, 326 Md. 179, 208, 604 A.2d 445, 459 (1992). Section 431 of the Restatement (Second) of Torts provides:

> The actor's negligent conduct is a legal cause of harm to another if
> (a) his conduct is a substantial factor in bringing about the harm, and
> (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

The issue of superseding causation is not even relevant unless the "antecedent negligence [of a third person] is a substantial factor in bringing about" the injury. *Balbos*, 326 Md. at 223, 604 A.2d at 466 (citing Section 440 of the Restatement (Second) of Torts which

provides, "[a] superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about").

Next, in order to consider a defendant's conduct to be a legally cognizable cause of the victim's injuries, it "requires us to consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Pittway*, 409 Md. at 245, 973 A.2d at 787. The legally cognizable analysis in multiple-causes cases is addressed by superseding causes:

> When multiple negligent acts or omissions are deemed a cause-in-fact of a plaintiff's injuries, the foreseeability analysis must involve an inquiry into whether a negligent defendant is relieved from liability by intervening negligent acts or omissions. . . . Liability is avoided only if the intervening negligent act or omission at issue is considered a superseding cause of the harm to the plaintiffs.

*Pittway*, 409 Md. at 247–48, 973 A.2d at 788–89. In analyzing the defense of superseding cause we have held that "a superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Pittway*, 409 Md. at 249, 973 A.2d at 789 (quoting *McGowans v. Howard*, 234 Md. 134, 138, 197 A.2d 915, 918 (1964)). Further, this Court has stated that Section 442 of the Restatement (Second) of Torts, Considerations Important in Determining Whether an Intervening Force is a Superseding Cause, "establishes the test that has been applied in Maryland courts for determining when an intervening negligent act rises to the level of a superseding cause." *Pittway*, 409 Md. at 248, 973 A.2d at 789. It provides:

The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

We cite to the proximate cause analysis—both cause-in-fact and legal cause—to illustrate that, "'unless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury.'" *Pittway*, 409 Md. at 253, 973 A.2d at 792 (quoting *Caroline v. Reicher*, 269 Md. 125, 133, 304 A.2d 831, 835 (1973)); *Banks v. Iron Hustler Corp.*, 59 Md. App. 408, 431, 475 A.2d 1243, 1254 (1984) ("Whether the intervening act of a third party suffices as a superseding cause is generally for the trier of fact to determine.").

We conclude the evidence submitted to the jury was relevant to the jury's determination as to superseding cause.[7] Dr. Park argues that five of the superseding factors

---

[7] While the respondents argue that the issue of superseding cause is moot because the jury decided Dr. Park was not negligent as he did not breach the standard of care (never deciding whether the other doctors' negligence constituted a superseding cause), we agree with the intermediate appellate court that this was not a moot issue. *Copsey*, 228 Md. App. at 116–17, 137 A.3d at 305. The petitioners argue the alleged negligence of subsequent treating doctors' omissions could have contaminated and prejudiced the jury's view of whether Dr.

from the Restatement were present in this case. Hence a reasonable trier of fact could have found that under (b), the doctors on June 9-10 knew or should have known that Mr. Copsey was on the verge of a fatal stroke and that it could have been prevented. The failures of the three doctors, who did not rely on Dr. Park's interpretations of the images, were extraordinary and unforeseeable as all three acted below the standard of care despite being presented with grave conditions. Even assuming that Dr. Park was negligent in his interpretation of the June 4 images and it was foreseeable that if left untreated, Mr. Copsey would have suffered from a fatal stroke, the jury was entitled to determine whether it was foreseeable that other doctors would have negligently treated the patient, days later, without reliance on Dr. Park's original interpretation of the images. Under (c), these were independent acts because none of the doctors on June 9-10 were relying on Dr. Park's report, even assuming that Dr. Park was initially negligent, and thus was a substantial factor in bringing about harm to Mr. Copsey.

The undisputed facts indicate that Dr. Blum had ordered a new report on June 9 because Mr. Copsey's condition had deteriorated. Moreover, nothing indicated that Dr. Viswanathan and Dr. Alkaitis relied on Dr. Park's report. Under (d), Dr. Blum, Dr. Viswanathan, and Dr. Alkaitis' actions were not connected to Dr. Park because they acted

---

Park breached the standard of care, which was an issue the jury actually decided. We note that the evidence submitted to the jury was relevant to the determination of whether Dr. Park was negligent, whether he was the proximate cause of Mr. Copsey's death, and whether or not the other doctors were intervening and superseding causes of Mr. Copsey's death. Moreover, Dr. Park was entitled to present a defense and demonstrate to the jury that he was not negligent and did not cause harm to the patient. Further, he was entitled to show how someone else was negligent and caused harm to the patient that was independent of any harm that he may have caused.

independently, or failed on their own to act reasonably. Under (e), the respondents' and the petitioners' experts testified regarding the negligence and wrongful acts of Dr. Blum, Dr. Viswanathan, and Dr. Alkaitis. The expert witnesses indicated that had the doctors acted on June 9-10, Mr. Copsey's fatal stroke would have been prevented. Under (f), the subsequent treating doctors all engaged in negligent conduct on June 9-10 resulting in Mr. Copsey's death. The jury was entitled to hear all the evidence regarding negligence, including the negligence of other non-parties. It was appropriate for the jury to determine whether Dr. Park was negligent and whether his negligence caused injury to the patient, taking into account whether the non-parties' actions were superseding causes of Mr. Copsey's fatal stroke. As noted by the Verdict Sheet, the jury was free to decide whether Dr. Park breached his duty of care, whether any such breach was the proximate cause of Mr. Copsey's death, and whether the other non-parties' acts or failures to act superseded the act of Dr. Park.

Negligence by a subsequent actor breaks the chain of causation when the action by the subsequent actor is extraordinary and not reasonably foreseeable. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 160–61, 642 A.2d 219, 232 (1994) (holding that a hotel employee was not the proximate cause of the victim's injury when he negligently left car keys in the ignition of an unattended van and a thief stole the car and drove it in a "highly extraordinary" manner, crashing into a stopped car). Liability continues if a defendant "could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence[.]" *Manor Inn*, 335 Md. at 160, 642 A.2d at 231 ("The defendant's negligence is not deemed the

proximate cause of the injury, when the connection is thus actually broken by a responsible intervening cause.") (quoting *Atlantic Mutual v. Kenny*, 323 Md. 116, 131, 591 A.2d 507, 514 (1991)).

The *Manor Inn* case involved an escaped patient from a State-operated hospital for the mentally ill who stole an unattended van, the keys to which were left in the ignition. *Manor Inn*, 335 Md. at 138, 642 A.2d at 221. While driving the van, the thief struck another vehicle, resulting in personal injuries and property damage to the victim. *Id.* We noted that the hotel was negligent and it was "reasonably foreseeable that, by leaving the keys in the ignition, a thief would take the van. . . . [B]ut for the negligence of Manor Inn, [the thief] would not have taken the van." 335 Md. 135 at 160, 642 A.2d at 231 ("Manor Inn clearly was the proximate cause of the theft of the van, [but] it does not follow that that causal relationship continued from the moment of the theft to the moment of the impact between the van and [the victim's] car."). However, it was not foreseeable that the thief would drive the vehicle negligently or strike the plaintiff. 335 Md. 135 at 160, 642 A.2d at 232.

Similar to *Manor Inn*, it was inferable that the evidence tended to show that treatment of the intervening actors, Dr. Blum, Dr. Viswanathan, and Dr. Alkaitis, broke the chain of causation created by Dr. Park's alleged negligence so that the negligence of the intervenors was the independent and superseding cause of Mr. Copsey's death. Assuming that Dr. Park was negligent in his interpretation of the images on June 4, the evidence tended to show that he should have foreseen that other doctors would have relied on his interpretation in treating Mr. Copsey, and failed to provide adequate care, leading to Mr.

Copsey's death. Dr. Park also could have foreseen that Mr. Copsey may not have sought out further treatment, thus, also leading to his death. However, Dr. Park could not have reasonably anticipated that Mr. Copsey would go on to be treated by three other physicians who did not rely on Dr. Park's June 4 interpretations of the images, ordered new images, and acted well below the standard of care in treating the patient. There was a clear break between June 4 and June 9; as the experts testified, had one of the subsequent treating physicians acted reasonably on June 9-10, Mr. Copsey would not have suffered from the fatal stroke, and his death could have been prevented. The independent actions of the other doctors in failing to provide adequate treatment, to follow up with each other, to reach out to the patient, and to communicate with one another were relevant to the jury's deliberation as to whether the actions were extraordinary and unforeseeable to Dr. Park.

The petitioners argue that the case at bar is similar to *Mehlman v. Powell*, 281 Md. 269, 378 A.2d 1121 (1977) and *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972), in that Dr. Park's negligence was a proximate cause of Mr. Copsey's death, and that Dr. Park's negligence was concurrent with that of the other three doctors, and therefore the trial judge erred in instructing the jury on superseding cause.[8] However, when there is

---

[8] While the respondents argue the jury instruction on superseding causation should have gone further to explain the *Pittway*/Restatement test, we agree with the Court of Special Appeals that the trial court did not err in giving the jury instruction.

> "The standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Univ. of Md. Med. Sys. Corp. v. Malory*, 143 Md.mApp. 327, 337, 795 A.2d 107, 113 (2001) (quoting *Farley v. Allstate Ins. Co.*, 355 Md. 34, 46, 733 A.2d 1014 (1999)). "This standard for reversible error places the burden on the complaining party to show both prejudice and error." *Farley*, 355 Md. at 46, 733 A.2d at 1020.

negligence by subsequent treating physicians, the initial treating physician's liability can be cut off if the subsequent negligence by another intervenes and supersedes the act or failure to act by the initial treating physician.

In *Mehlman v. Powell*, the plaintiffs accused a hospital and two doctors of negligently causing a patient's death. *Mehlman*, 281 Md. at 271–72, 378 A.2d at 1122. Dr. Cosca misread an EKG which led to the patient's release from the hospital and later death from an undetected pulmonary embolism. 281 Md. at 275-76, 378 A.2d at 1124. Dr. Cosca alleged that the hospital staff and the patient's internist failed to realize his error and inform him that he had misread the EKG. *Id.* The jury returned a verdict against all three defendants, which Dr. Cosca appealed. 281 Md. at 272, 378 A.2d at 1123. He argued that the lower court erred in denying his motion for directed verdict and that he did not cause the patient's death as his negligence was superseded by the negligence of the other medical

---

*Exxon Mobil Corp. v. Ford*, 433 Md. 426, 465, 71 A.3d 105, 128 (2013). The jury instruction provided by the trial judge was a fair representation of the superseding cause defense. The trial judge stated:

> If you find that Dr. Park was negligent, but that the negligent acts or omissions of another person also contributed to causing Mr. Copsey's death, then you have to decide whether the other person's acts or omissions were [the] intervening and superseding cause of Mr. Copsey's death. In order to excuse Dr. Park that intervening cause must be a superseding cause of Mr. Copsey's death. It is a superseding cause if it so entirely supersedes the operation of Dr. Park's negligence that it alone, without Dr. Park's negligence contributing thereto in the slightest degree, produces the injury. Or I should – yes, I should say produced the injury. Dr. Park's negligence is not the cause of Mr. Copsey's death when the connection is thus actually broken by another person's acts or omissions. But the connection is not actually broken if another person's acts or omissions might in the natural and ordinary course of things be anticipated as not entirely improbable and Dr. Park's negligence is an essential link in the chain of causation.

providers. 281 Md. at 275, 378 A.2d at 1124. This Court held that the trial court did not err in denying the motion and upheld the jury's verdict that the subsequent acts of negligence were not superseding causes absolving the doctor of liability. 281 Md. at 276, 378 A.2d at 1125. The critical negligence in misreading the EKG remained the continuing cause of the patient's death. *Id.* There was no clear break in events, like the June 9-10 independent treatment in the case at bar, and thus the subsequent omissions merely "operate[d] along with [Dr. Cosca's] negligence" as "an ordinary case of concurring negligence." *Id.* Dr. Cosca's misreading of the EKG contributed to the patient's death; there was one continuous cause—just because the other doctor and the nurses did not catch Dr. Cosca's mistake did not break a link in the chain of causation. This is unlike the case *sub judice*, where there was a break in the chain of events that began with Dr. Park's original interpretation of the images, followed by new treatment, days later, from three other doctors who did not rely on Dr. Park's interpretation but who could have timely prevented the patient's fatal stroke.

This Court, in *Mehlman*, also did not hold that it was error for a trial court to permit the defendant physician, who was the first to allegedly provide negligent treatment to a patient, to present evidence of the negligence of the subsequent treating physicians. Dr. Park, like Dr. Cosca, was able to present evidence of superseding causes attributable to the negligence of others as a part of his defense.

In *Thomas v. Corso*, we held that there was sufficient evidence for the jury to conclude that the defendant emergency room physician, Dr. Thomas, was negligent when he did not arrive timely to the hospital to treat a patient who had been injured in an

- 28 -

automobile collision. *Thomas*, 265 Md. at 103, 288 A.2d at 390. Dr. Thomas, the on-call doctor at the time, was notified that the patient had been struck by a car, had an abrasion on his forehead, and was complaining of numbness in his right thigh. *Thomas*, 265 Md. at 99, 288 A.2d at 388. Due care requires that a physician be physically present to examine the patient, particularly after an automobile accident. *Id.* Dr. Thomas argued that the on duty nurses at the hospital were negligent in failing to call him at 12:05 a.m. when the patient was exhibiting symptoms of shock and therefore needed the immediate attention of a doctor. 265 Md. at 94, 288 A.2d at 386. According to Dr. Thomas, the nurses failing to call him back when the patient's symptoms worsened "was an intervening act of sufficient negligence which broke the chain of causation between his negligence and Corso's death." 265 Md. at 103, 288 A.2d at 390. This Court, however, held that "the jury could have reasonably concluded that under the circumstances of this case that if Dr. Thomas had performed his duty to attend Corso personally, shortly after he was telephoned at 11:30 p.m., Dr. Thomas might well have been able to have saved his life." *Id.* Further, "[Dr. Thomas'] negligent conduct was one of the direct and proximate causes of Corso's death, concurrent with the negligence of the nurses." *Id.* Notwithstanding Dr. Thomas' negligence, he was permitted to present testimonial evidence of the nurses' subsequent negligence in an attempt to prove he was not liable. 265 Md. at 100–01, 288 A.2d at 389.

Similar to the *Thomas* case, Dr. Park was entitled to present evidence of the subsequent negligence of other individuals in his own defense. Unlike in *Thomas*, where the negligence of Dr. Thomas occurred within the same hour of the patient's deteriorating condition and ensuing death, here there was, at least, a six-day gap between Dr. Park's

alleged negligence and the alleged negligence of the three subsequent treating doctors. Between June 4 and June 9, Mr. Copsey presented new symptoms, new images were taken and interpreted by Dr. Blum and Dr. Viswanathan, Dr. Park's interpretation of the images were not relied on, and both Dr. Viswanthan and Dr. Alkaitis were actually aware of Mr. Copsey's impending stroke, but failed to notify him or render immediate medical attention. On June 9, Dr. Blum determined that Mr. Copsey needed urgent testing because of his new symptoms and therefore placed a STAT order to the radiologist asking for an immediate response. Dr. Park's interpretation of images on June 4 was unrelated to Dr. Blum's decision to send Mr. Copsey home on June 9, without waiting for a report on the results and interpreting Mr. Copsey's symptoms and images on his own. The jury could reasonably have found that these events both were not foreseeable by Dr. Park and extraordinary.

Moreover, expert witnesses called by Dr. Park to testify, namely, Dr. O'Sullivan and Dr. Hyman, both radiologists like Dr. Park, pointed out that they conducted objective blind reviews to prevent bias and did not notice any abnormalities that went unnoticed by Dr. Park on June 4. On the other hand, the petitioners' expert witnesses, Dr. Hecht, a neurologist like Dr. Blum, and his partner Dr. Jahre, a radiologist/neuroradiologist, testified that abnormalities should have been detected by Dr. Park. However, there was evidence at trial that both doctors may have been biased in their review of the images. The jury was permitted to give the testimony of a witness the weight the jury believed the testimony deserved. *Plastic Assembled Prod., Inc. v. Benkoe*, 224 Md. 256, 259, 167 A.2d 589, 591 (1961). Moreover, Dr. O'Sullivan and Dr. Hyman testified that Dr. Park was not negligent

and acted within the standard of care. Thus, all of the evidence was for the jury to weigh in determining whether Dr. Park was negligent, and if he was, whether the intervening actions of the subsequent treating physicians were independent and superseding causes of Mr. Copsey's death.

Ultimately, the jury was persuaded that Dr. Park was not negligent. Dr. Park was entitled to show both that he was not negligent and that he did not cause Mr. Copsey's injury.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the Court of Special Appeals. Dr. Park, who generally denied liability, was entitled to present evidence of the non-parties' negligence as it was relevant and necessary in providing him a fair trial. Further, causation was an issue for the trier of fact and the evidence Dr. Park presented tended to show that he was not negligent and that other independent causes contributed to the death of Mr. Copsey.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**